**BRETT A. SHUMATE**
Assistant Attorney General
Civil Division
**ERIC J. HAMILTON**
Deputy Assistant Attorney General
**STEPHEN M. ELLIOTT**
Assistant Branch Director
**KATHRYN BARRAGAN (D.C. Bar No. 90026294)**
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 598-7696
Email: kathryn.e.barragan@usdoj.gov
*Counsel for Defendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **JAMES M. RICKHER**, | Case No.: 3:26-cv-00569-AR |
| Plaintiff, | |
| v. | **DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S FIRST AMENDED MOTION FOR A PRELIMINARY INJUNCTION** |
| **MEGAN SULLIVAN**, in her official capacity as Acting Chief of Design Management at the United States Mint, *et al.*, | |
| Defendants. | |

Fed. Defs.' Opp'n to Pl.'s Am. Mot. for Preliminary Injunction

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ......................................................................................................................... 2

I.      Statutory Background ..................................................................................................... 2

        A.      The Bureau of Printing & Engraving and the Thayer Amendment ...................... 2

        B.      Coins Depicting Living Persons Post-Thayer Amendment ................................. 3

        C.      The 1982 Codification of the Thayer Amendment ................................................ 5

II.     Factual Background ........................................................................................................ 6

        A.      The United States Mint ....................................................................................... 6

        B.      The Proposed Coin .............................................................................................. 6

        C.      This Litigation ..................................................................................................... 8

LEGAL STANDARD................................................................................................................. 8

ARGUMENT ............................................................................................................................. 9

I.      This Court Lacks Jurisdiction ........................................................................................ 9

        A.      Plaintiff Lacks Standing...................................................................................... 9

        B.      Plaintiff's Challenge Is Not Ripe for Judicial Review....................................... 13

II.     Plaintiff Is Not Likely to Succeed on the Merits ......................................................... 15

        A.      There is No Final Agency Action. ..................................................................... 15

        B.      The Agency's Design Decisions Are Committed to Agency Discretion
                by Law ................................................................................................................ 18

        C.      Depicting the President on the Proposed Coin Is Not Contrary to Law ............. 19

                1. Subsection 5114(b) Applies Only to Paper Currency, Not Coins .................... 19

                2. Section 5112(i), Not Section 5112(y), Governs the Proposed Coin ............... 24

        D.      Plaintiff's Nonstatutory Ultra Vires Claim Fails ............................................... 26

III.    Plaintiff Cannot Show Irreparable Harm. .................................................................... 26

IV.     The Balance of the Equities and the Public Interest Favor Defendants............................ 29

V.      Any Injunctive Relief Should be Narrowly Tailored......................................................... 31

VI.     Any Injunctive Relief Should be Stayed Pending Appeal and Be Accompanied by
        a Bond. ..................................................................................................................... 32

CONCLUSION ................................................................................................................................ 32

# TABLE OF AUTHORITIES

**Cases**

*Abbott Lab'ys v. Gardner*,
387 U.S. 136 (1967), abrogated on other grounds by *Califano v. Sanders,*
430 U.S. 99, 105 (1977) .................................................................................. 14, 17

*Allen v. Wright*,
468 U.S. 737 (1984), abrogated on other grounds by *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118 (2014) .................................................................. 13

*Am. Foreign Serv. Ass'n v. Trump*,
No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025) ..................................... 26

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ......................................................................................... 12, 13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................... 12

*Bennett v. Isagenix Int'l LLC*,
118 F.4th 1120 (9th Cir. 2024) ............................................................................. 27

*Bennett v. Spear*,
520 U.S. 154 (1997) .......................................................................................... 16, 17

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ............................................................................................... 31

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) ........................................................................... 27, 28

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......................................................................................... 10, 11

*Clark v. Rameker*,
573 U.S. 122 (2014) ............................................................................................... 22

*Colwell v. Dep't of Health & Hum. Servs.*,
558 F.3d 1112 (9th Cir. 2009) ........................................................................... 14, 15

*Nuclear Regul. Comm'n v. Texas*,
605 U.S. 665 (2025) ............................................................................................... 26

*Coons v. Lew*,
762 F.3d 891 (9th Cir. 2014) ................................................................................ 12

*Corley v. United States*,
556 U.S. 303 (2009) ........................................................................................................ 22

*County of Esmeralda v. Dep't of Energy*,
925 F.2d 1216 (9th Cir. 1991) ........................................................................................ 18

*Ctr. for Food Safety v. Vilsack*,
636 F.3d 1166 (9th Cir. 2011) ........................................................................................ 29

*Edwards Vacuum, LLC v. Hoffman Instrumentation Supply, Inc.*,
538 F.Supp.3d 1132 (D. Or. 2021) .................................................................................. 27

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024) ........................................................................................................ 10

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ........................................................................................................ 20

*Forsyth County v. Army Corp. of Eng'rs*,
633 F.3d 1032 (11th Cir. 2011) ...................................................................................... 18

*Franklin v. Massachusetts,*
505 U.S. 788 (1992) ........................................................................................................ 17

*Haig v. Agee*,
453 U.S. 280 (1981) ........................................................................................................ 18

*Harrison v. PPG Indus., Inc.*,
446 U.S. 578 (1980) ........................................................................................................ 17

*L.A. Mem'l Coliseum Comm'n v. NFL*,
634 F.2d 1197 (9th Cir. 1980) ........................................................................................ 27

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ................................................................................................. *passim*

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) ........................................................................................................ 14

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) .......................................................................................... 29

*Laird v. Tatum*,
408 U.S. 1 (1972) .............................................................................................. 12, 13, 16

*Munaf v. Geren*,
553 U.S. 674 (2008) ..................................................................................................... 9, 28

*Muniz v. Hoffman*,
    422 U.S. 454 (1975)..................................................................................................... 23

*Murthy v. Missouri*,
    603 U.S. 43 (2024)....................................................................................................... 31

*Nat. Res. Def. Council v. Abraham*,
    388 F.3d 701 (9th Cir. 2004) ...................................................................................... 14

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
    538 U.S. 803 (2003)..................................................................................................... 14

*Newdow v. Congress*,
    435 F. Supp. 2d 1066 (E.D. Cal. 2006)....................................................................... 13

*Nielsen v. Preap*,
    586 U.S. 392 (2019)..................................................................................................... 22

*Nken v. Holder*,
    556 U.S. 418 (2009)................................................................................................. 9, 31

*Norton v. Southern Utah Wilderness All.*,
    542 U.S. 55 (2004)................................................................................................. 15, 16

*Ocean Beauty Seafoods, LLC v. Pac. Seafood Grp. Acquisition Co., Inc.*,
    648 F. App'x 709 (9th Cir. 2016) ........................................................................... 27, 29

*Oklahoma v. Castro-Huerta*,
    597 U.S. 629 (2022)..................................................................................................... 23

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*,
    465 F.3d 977 (9th Cir. 2006) ...................................................................................... 17

*Pinnacle Armor, Inc. v. United States*,
    648 F.3d 708 (9th Cir. 2011) ...................................................................................... 18

*Pom Wonderful LLC v. Hubbard*,
    775 F.3d 1118 (9th Cir. 2014) .................................................................................... 28

*Small ex rel. NLRB v. Operative Plasterers' & Cement Masons' Int'l Ass'n Loc. 200*,
    611 F.3d 483 (9th Cir. 2010) ...................................................................................... 28

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)................................................................................................. 9, 10

*Stavrianoudakis v. U.S. Fish & Wildlife Serv.*,
    108 F.4th 1128 (9th Cir. 2024) ................................................................................... 14

*Texas v. United States*,
   523 U.S. 296 (1998).................................................................................................. 14, 15

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021)............................................................................................ 1, 11, 13

*Ukiah Valley Med. Ctr. v. F.T.C.*,
   911 F.2d 261 (9th Cir. 1990) ............................................................................................ 17

*United States v. Maciel-Alcala, 598 F.3d 1239 (9th Cir.), opinion amended and superseded,*
   *612 F.3d 1092 (9th Cir. 2010)* ............................................................................................ 19

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
   454 U.S. 464 (1982).............................................................................................. 11, 13

*Whitewater Draw Natural Resource Conservation District v. Mayorkas*,
   5 F.4th 997 (9th Cir. 2021) ............................................................................................ 15, 16

*Whitman v. Am. Trucking Ass'n*,
   531 U.S. 457 (2001)............................................................................................................ 17

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)............................................................................................................ 9, 27

## Statutes

5 U.S.C. § 701(a)(2)............................................................................................................ 18

5 U.S.C. § 704.................................................................................................................... 15, 16

31 U.S.C. § 5103 ............................................................................................. 6, 7, 8, 20, 21

31 U.S.C. § 5112........................................................................................................*passim*

31 U.S.C. § 5114........................................................................................................*passim*

31 U.S.C. § 5135................................................................................................................ 31

31 U.S.C. § 5136................................................................................................................ 8

Pub. L. No. 104-208, 110 Stat. 3009 (1996)................................................................... 24

Pub. L. No. 66-200, 41 Stat. 594 (1920).......................................................................... 4

Pub. L. No. 97-258, 96 Stat. 877 (1982)
   (codified as amended at 31 U.S.C. §§ 101–9704) ........................................... 5, 23, 24

Pub. L. No. 99-185, 99 Stat. 1177 (1985).......................................................................... 24

Pub. Res. No. 68-62, 43 Stat. 1253 (1925) ...................................................................... 4

**Rules**

Fed. R. Civ. P. 65(c) ....................................................................................................... 32

**Books & Periodicals**

McCarty, Keeley, *Flip the Coin to the Fed: A Comment on the Dysfunctional Relationship Among the Federal Reserve System, Congress, and the United States Mint*, 64 Admin. L. Rev. 315 (2012) .................................................................................. 3

R.W., Julian, *Do Living People Belong on Currency?*, Numismatic News, VOL. 62, ISSUE 52 AT 18, (Dec. 31, 2013) .................................................................. 4

U.S. Nat'l Monetary Comm'n, *Financial Laws of the United States, 1788–1909*, vol. 2, (1911) ............................................................................................................... 3

U.S. Treas. Dep't, *History of the Bureau of Engraving and Printing, 1862–1962,* (1964) ................................................................................................................... 3

**Other Authorities**

U.S. Mint, Sesquicentennial of American Independence Half Dollar (1926), https://www.usmint.gov/learn/coins-and-medals/commemorative-coins/sesquicentennial-of-american-independence-half .................................................................................. 5

**INTRODUCTION**

Plaintiff's challenge to Defendants' non-final proposal to mint a limited set of coins in celebration of the United States semiquincentennial fails. To start, Plaintiff lacks standing. Plaintiff describes himself as a novice coin collector and admits that he has taken no concrete or even tentative action with respect to the not-yet-issued, proposed coin. Indeed, he does not even contend that he plans to attempt to procure a coin. This alone precludes standing under *Lujan v. Defenders of Wildlife* because standing requires more than an abstract interest or speculation about a future possibility. 504 U.S. 555, 563 (1992). Plaintiff's remaining standing arguments amount to a generalized grievance, not a showing of the concrete, individualized harm required for standing. Article III demands a "personal stake in the case." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citation modified). Plaintiff does not come close to making that showing.

The Court also lacks jurisdiction because Plaintiff's claim is premature. It is not ripe because the proposed coin design has not been approved by the Secretary of the Treasury ("Treasury"). Because the Secretary may propose changes to the proposed design, the United States Mint ("Mint") does not begin producing coins until the Secretary finally approves the coin design, which has not yet occurred. Not to mention that Plaintiff points to no legal or practical harms that will occur because of the coin's eventual finalization and issuance.

Further, Plaintiff's claims fail on the merits. His Administrative Procedure Act ("APA") claims fail for several reasons. There is no final agency action here, and the authorizing statutory subsection commits the design of coins to agency discretion. Plaintiff's contention that the proposed coin is contrary to Section 5114 is incorrect, because the statute's text, structure, and history make clear that it regulates paper currency only, not coinage. And Plaintiff's contention that the Government violated Section 5112(y) is misplaced. That subsection does not provide the

authorization for the proposed coin, but even if it was the statutory basis for the agency action, the coin's proposed design does not violate it. Plaintiff also errs in arguing that a living person cannot be depicted on coinage. The United States has previously depicted a sitting President on coinage. Indeed, in 1926, then-President Calvin Coolidge was depicted on a coin in celebration of the United States sesquicentennial celebration. And the statute authorizing the proposed coin at issue here, 31 U.S.C. § 5114(i)(4)(C), contains no prohibition on depicting living individuals. Plaintiff's *ultra vires* claim—which recycles his earlier argument regarding a violation of Section 5114 under the APA—cannot be brought where he has an adequate alternative remedy under the APA.

Lastly, Plaintiff does not establish the required irreparable harm and public interest in emergency relief. Plaintiff must allege irreparable harm to himself, and he cannot point to any personal harm that meets the extraordinary burden required to demonstrate irreparable harm. The harm Plaintiff alleges is speculative and has not been incurred. Accordingly, his motion fails on that shortcoming alone. Finally, the public interest weighs in the government's favor where the government seeks to exercise the discretion Congress gave to the Treasury—designing and minting coins in accordance with the duly elected executive branch's policy choices.

## BACKGROUND

### I.      Statutory Background

#### A.      The Bureau of Printing & Engraving and the Thayer Amendment

In the early days of the United States, coins produced by the Mint were the only money issued by the government. *See* TREAS. DEP'T, HISTORY OF THE BUREAU OF ENGRAVING AND PRINTING, 1862-1962 XVIII (1964). However, the Civil War led to a shortage of coins as people were incentivized to melt them down for their intrinsic bullion value. *Id.* at 1–9. To solve the issue, and to finance a costly war, Congress formed the Bureau of Engraving and Printing ("BEP") in

1862. *Id.* The BEP was charged with printing paper currency, thus setting up the dual structure still in existence today, with the Mint producing coins and the BEP printing all forms of paper currency. *See, e.g.,* Keeley McCarty, *Flip the Coin to the Fed: A Comment on the Dysfunctional Relationship Among the Federal Reserve System, Congress, and the United States Mint*, 64 Admin. L. Rev. 315, 319–320 (2012).

Just two years after the BEP was formed, a scandal engulfed its first chief, Spencer Morton Clark. *See* TREAS. DEP'T, HISTORY OF THE BUREAU OF ENGRAVING AND PRINTING, 1862-1962, AT 12 (1964). The scandal involved a Congressional directive that the BEP depict William Clark, of Lewis and Clark fame, on the five-cent paper note. *See* R.W. Julian, *Do living people belong on currency?*, NUMISMATIC NEWS, VOL. 62, ISSUE 52 AT 18 (Dec. 31, 2013). However, Congress simply asked to put "Clark" on the note. *Id.* Spencer Morton Clark's own portrait was instead placed on the note, sparking controversy and the eventual passage of the so-called "Thayer Amendment," introduced by Pennsylvania Congressman M. Russell Thayer, in 1866. *Id.* at 18, 41.

The Thayer Amendment forms the basis of Plaintiff's challenge. *See* Plaintiff's First Amended Motion for a Preliminary Injunction ("Pl.'s Am. Mot.") at 9–10, ECF No. 6; *see also* Plaintiff's First Amended Complaint ("Am. Compl.") ¶ 14, ECF No. 7. The Thayer Amendment stated: "no portrait or likeness of any living person hereafter engraved, shall be placed upon any of the bonds, securities, notes, fractional, or postal currency of the United States." *See* U.S. NAT'L MONETARY COMM'N, FIN. LAWS OF THE U.S., VOL. II, 1788-1909, at 191 (1911). The Amendment expressly enumerated certain types of paper notes and securities printed by the BEP, but notably excluded coins.

Fed. Defs.' Opp'n to Pl.'s Am. Mot. for Preliminary Injunction - 3

B.      **Coins Depicting Living Persons Post-Thayer Amendment**

The Thayer Amendment's limitation to paper currency has allowed for living persons to be depicted on coinage since its passage, including the depiction of a then-living President on a coin. *See* Declaration of April Stafford ("Stafford Decl.") at ¶ 37–40 (May 18, 2026).

- In 1921, the Secretary approved the depiction of then-current governor Thomas Kilby of Alabama on the Alabama Centennial Half Dollar, pursuant to a Congressional directive to mint coins in commemoration of the one hundredth anniversary of the admission of Alabama as a state. Stafford Decl. ¶ 37, Ex. B (citing Pub. L. No. 66-200 (1920)); *see also* Julian, *supra*, at 17–18.

- Five years later, pursuant to a Congressional resolution to mint coins in honor of the sesquicentennial, the Secretary approved the depiction of then-President Calvin Coolidge on the 1926 Sesquicentennial Half Dollar alongside George Washington, marking the first time a living president was featured on a U.S. coin.[1] Stafford Decl. ¶ 38, Ex. C; *see also* Julian, *supra*, at 17–18.

- In 1995, Congress authorized the United States Mint to mint coins in honor of the Special Olympics World Games. Stafford Decl. ¶ 39, Ex. D. Congress did not specify the coin design, instead leaving it to the Secretary's discretion. *Id.* The approved coin depicted then-living Eunice Kennedy Shriver, the founder of the Special Olympics. *Id.*; *see also* Julian, *supra*, at 17–18.

---

[1] Plaintiff contends, without citation, that Congress expressly directed the Mint to depict President Coolidge on the coin. *See* Pl.'s Am. Mot. at 8–9. That is incorrect. The joint resolution did not expressly direct President Coolidge to be depicted on the coin or even mention President Coolidge. *See* Pub. Res. No. 68-62 (1925); *see also* U.S. Mint, *Sesquicentennial of American Independence Half Dollar* (1926), https://www.usmint.gov/learn/coins-and-medals/commemorative-coins/sesquicentennial-of-american-independence-half.

Fed. Defs.' Opp'n to Pl.'s Am. Mot. for Preliminary Injunction - 4

C.    **The 1982 Codification of the Thayer Amendment**

The statutory history of Section 5114(b) explains why the general word "currency" is used in a provision that applies only to paper notes. An earlier codification of the Thayer Amendment in the United States Code was titled "[p]ortraits of living persons on bonds or notes" and stated: "[n]o portrait shall be placed upon any of the bonds, securities, notes, fractional or postal currency of the United States, while the original of such portrait is living."[2]

In 1982, Congress consolidated and reorganized statutes pertaining to the financial system. *See* H.R. 6128, Pub. L. No. 97–258, 96 Stat 877 (1982). The 1982 Act was titled, "[a]n Act to revise, codify, and enact *without substantive change* certain general and permanent laws, related to money and finance." *Id.* (emphasis added).

As part of that effort, the living portrait prohibition on bonds and notes was reorganized to 31 U.S.C. § 5114(b).[3] The language was revised as part of that update, and altered to the version now in effect: "[o]nly the portrait of a deceased individual may appear on United States currency and securities."[4] The stated reason for this change was "clarity."[5]

Similarly, the reviser's notes state that the earlier statutory phrase barring living portraits in "bonds, securities, notes, fractional or postal currency" was replaced with "currency," for "consistency in the revised title."[6] The reviser's notes do not indicate any substantive change in the law.[7]  Taken together, the statutory history and reviser's notes confirm that Congress intended Section 5114(b) to preserve the Thayer Amendment's preexisting prohibition on living portraits

---

[2] *See* 31 U.S.C. § 5114 note (House of Representatives, Office of Law Revision Counsel editorial notes), *available at* https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title31-section5114&num=0&edition=prelim.
[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*

appearing on paper notes and related instruments, rather than to substantively expand the provision to United States coinage.

## II.    Factual Background

### A.    The United States Mint

The Mint is responsible for creating initial design concepts of coinage and developing a final design recommendation to the Secretary of the Treasury for review and selection. *See* Stafford Decl., at ¶ 9. If the Secretary agrees with the Mint's proposal, the Secretary signs an action memorandum denoting his or her concurrence with the design recommendation. *Id.* ¶ 10. If the Secretary disagrees, he or she may propose changes to the design, and the design process may re-start entirely. *Id.* ¶ 9–10. Only when the design is finalized and approved by the Secretary does the Mint initiate the production process. *Id.* ¶ 10. The rate of production for collectors' coins, or numismatic coins, is generally slower than regular circulating coins. *Id.* ¶ 12.

The Mint has created various gold coin designs, sizes, and denominations over the past two decades under the authority of 31 U.S.C. § 5112(i)(4)(C). *Id.* ¶ 24. Gold coins are sold at a price that exceeds the face value of the coin and encompasses the value of the precious metal plus the Mint's manufacturing costs. *Id.* ¶ 25. Minted gold coins are legal tender based on their face value, or denomination. *See* 31 U.S.C. § 5103 ("United States coins and currency . . . are legal tender[.]"). However, as numismatic items and given their bullion value, gold coins are not intended for everyday circulation and are seldom, if ever, used in commerce. Stafford Decl. ¶ 25.

The Mint occasionally relies on auctions for the sale of unique or rare coins. *Id.* ¶¶ 26–28. In such cases, the Mint obtains the service of a private auction house through a competitive solicitation process that takes several weeks. *Id.* ¶ 28.

### B.    The Challenged Proposed Coin

The Mint is currently designing a 24-karat gold coin depicting President Trump in celebration of the United States semiquincentennial. *Id.* ¶ 29, Ex. A. The Mint has proposed producing only 47 of these coins. *Id.* ¶ 32. The proposed coins will be legal tender, but because their bullion value will far exceed their face value, they are only meant as numismatic or collector's items and are not intended for circulation. *Id.*

In March 2026, a proposed design was presented to the Commission of Fine Arts, which proposed certain changes to the design.[8] Since that meeting, the Mint has proposed a revised design to the Secretary of the Treasury. Stafford Decl. ¶ 33. However, the Secretary has not approved the proposal. *Id.* The Secretary could request changes to the Mint's proposed design, and certain features or details regarding the coin may be rejected. *Id.* Given the uncertainty, the Mint does not consider a design to be finalized and takes no action with respect to the proposal until the Secretary approves it. *Id.* ¶¶ 10, 33. If the Secretary approves, and assuming no significant changes are required, the Mint estimates that several months would be required to begin issuing coins, given the complex manufacturing process. *Id.* ¶ 35. Once production has begun, the Mint estimates it would take several months to produce the target number of 47 coins, because the Mint can only produce around two of them per week. *Id.*

Although no contract solicitation for the proposed coin has been announced given that the design is not final and production has not begun, the Mint intends to auction the proposed coins. *Id.* ¶ 36. The Mint does not intend to begin the solicitation process unless and until the coin is finally approved by the Secretary. *Id.* The Mint anticipates that any auction of the coin would lag production several weeks, as the selected auction house would need time to inspect the coins,

---

[8] Comm'n of Fine Arts, *Minutes for CFA Meeting—19 March 2026*, https://www.cfa.gov/records-research/record-cfa-actions/2026/03/cfa-meeting/minutes (last visited May 18, 2026).

obtain an independent grading by a third-party service, and advertise the sale. *Id.* Therefore, once the proposed coin design is approved and finalized, and assuming no changes, the proposed coin would still require several months to mint and finalize for auction. *Id.*

There is no target date for the proposed coin. *Id.* ¶ 34. While the Semiquincentennial is on July 4, 2026, the coin cannot be issued by that date given the time required to manufacture and then organize an auction. *Id.* ¶¶ 31–36. And to be clear, proceeds from the auction will be deposited into the Public Enterprise Fund (established by 31 U.S.C. § 5136) to support the Mint's operations and programs. *Id.* ¶ 14.

### C.    This Litigation

Plaintiff brought this lawsuit on March 24, 2026, and moved for a preliminary injunction on the same day. ECF Nos. 1, 4. Two weeks later, on April 7, 2026, Plaintiff filed an amended complaint and an amended preliminary injunction motion. *See* Pl.'s Am. Mot & Am. Compl. On April 9, 2026, Plaintiff filed a "notice of supersession" requesting that the Court withdraw his original preliminary injunction motion; the Court issued an order to that effect. ECF Nos. 14, 15.

Plaintiff challenges "the United States . . . Mint's approval and imminent issuance of a 24-karat gold commemorative coin bearing the likeness of President Donald J. Trump." Am. Compl. ¶ 1. Plaintiff's amended complaint brings three claims: (1) a claim that the action is contrary to law under the APA for allegedly violating of 31 U.S.C. § 5114(b); (2) a non-statutory *ultra vires* claim based on a violation of the same statute, 31 U.S.C. § 5114(b); and (3) a claim that the action is contrary to law under the APA for allegedly violating 31 U.S.C. § 5112(y). *See generally id*.

Plaintiff's amended motion seeks a preliminary injunction "enjoining Defendants, their officers, agents, servants, employees, contractors, and all persons in active concert or participation with them, from producing, distributing, issuing, selling, or otherwise placing into commerce any

coin bearing the likeness of President Donald J. Trump, pending final resolution of this action." Pl.'s Am. Mot. at 16.

## LEGAL STANDARD

A "preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation modified). A district court should enter a preliminary injunction only "upon a clear showing that the [movant] is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the moving party must demonstrate (1) that it is likely to succeed on the merits of its claims; (2) that it is likely to suffer an irreparable harm in the absence of injunctive relief; (3) that the balance of equities tips in its favor; and (4) that the proposed injunction is in the public interest. *Id.* at 20. Finally, when "the Government is the opposing party[,]" the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiff cannot satisfy these requirements.

## ARGUMENT

### I.      This Court Lacks Jurisdiction

#### A.      Plaintiff Lacks Standing

As an initial matter, Plaintiff's lack of standing ends this case and bars issuance of a preliminary injunction.

Standing requires three canonical elements. A plaintiff must show: (i) an "injury in fact," that is, a violation of a legally protected interest that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (ii) a causal connection between the injury and the defendant's conduct such that the injury is "fairly . . . traceable to the challenged action"; and (iii) that it is "likely, as opposed to merely speculative that the injury will be redressed by a favorable

decision." *Lujan,* 504 U.S. at 560–61 (citation modified). The plaintiff "bears the burden of establishing these elements[,]" and therefore "must clearly . . . allege facts demonstrating each." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation modified). The alleged injury in fact cannot be "speculative—meaning that the injury must have already occurred or be likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). If the injury has not materialized, it must be "*certainly impending,*" and "[a]llegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original).

As an initial matter, Plaintiff does not argue in favor of standing in his motion for a preliminary injunction. He makes no effort to "establish[] these elements," and has not directed the Court to any theory that might support standing. *See Spokeo*, 578 U.S. at 338. Indeed, Plaintiff points the Court to no case brought by any plaintiff where a court found a situated similarly plaintiff to have standing. Nor could Plaintiff have cited any case, because no cognizable theory supports standing in this matter.

Looking to the Amended Complaint to construct Plaintiff's potential theory of standing, Plaintiff's allegations themselves plead Plaintiff out of standing. As Plaintiff admits, Plaintiff has not made any "affirmative decision[] regarding the unlawful coin, i.e., whether to acquire, avoid, or respond to it, in a market that should not contain it[.]" Am. Compl. ¶ 33. Under the leading standing case, *Lujan*, Plaintiff cannot maintain his suit with that concession.

In *Lujan*, plaintiffs sought to challenge governmental development projects that could affect certain endangered species. 504 U.S. at 563–564. However, plaintiffs failed to allege any concrete plans to return to the areas of challenged government projects. *Lujan,* 504 U.S. at 565; *see also id.* at 579 (Kennedy, J. concurring) (noting that respondents had no "personal stake in the outcome" where they had not "acquire[d] airline tickets" or "announce[d] a date certain upon

which they will return" to a development project (citation modified)). That is, plaintiffs had no "actual or imminent" injury because they had failed to allege the required concrete plans to utilize the environment that the governmental project was set to develop. *Id.*

Here, the Plaintiff's situation is even more lacking: Plaintiff admits he has no concrete plans to purchase the coin at all and admits that he has made no concrete or even tentative decisions "to acquire, avoid, or respond to" the challenged government action. Am. Compl. ¶ 33. Plaintiff's harms are thus speculative and abstract, and he instead brings a "generalized grievance" with a government policy within the holding of *Lujan*. 504 U.S. at 575 (citation omitted); *see also Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982). That forecloses standing.

Moreover, a voluntary decision made in response to a government action is not legal harm. As the Supreme Court made clear in *Clapper*, plaintiffs cannot "manufacture standing" by "inflicting harm on themselves" or voluntarily changing their behavior "based on [] fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. A plaintiff's voluntary decisions or costs incurred in response to hypothetical harm cannot manufacture standing.

Plaintiff creates three additional characterizations of harm. Am. Compl. ¶ 33. Specifically, Plaintiff alleges a "market integrity" harm, a "chilling" harm, and a "dignitary" harm. *Id.* None can overcome what *Lujan* forbids. Moreover, none demonstrate the "personal stake" in the case required for standing. *TransUnion*, 594 U.S. at 423 (citation omitted).

"Market Integrity" Harm. Plaintiff contends that the proposed coin will "corrupt the regulatory and taxonomic framework on which Plaintiff relies in making collecting decisions and that underpins the value of his existing collection[.]" Am. Compl. ¶ 33. Plaintiff provides no detail

beyond this unclear assertion. To the extent Plaintiff simply alleges that the coin violates the law, the Supreme Court long ago foreclosed standing based on such an interest in simply enforcing the law. *See TransUnion*, 594 U.S. at 426 ("Article III standing requires a concrete injury even in the context of a statutory violation." (citation omitted)). To the extent Plaintiff suggests that creation of the coin will affect the value of any existing coins, he has failed to plausibly plead any facts that would support this assertion. A conclusory assertion without such plausible facts cannot be credited. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Indeed, Plaintiff provides no information about (1) the value of his collection; (2) what kind of coins are in his collection; (3) what parts of the statutory or regulatory scheme authorized the coins he has in his collection, if any; (4) and why the proposed coin would affect his collection or cause him to suffer actual financial harm. *Coons v. Lew*, 762 F.3d 891, 898 (9th Cir. 2014), *as amended* (Sept. 2, 2014).

"Chilling" Harm. Plaintiff's chilling contention is even further afield. In its entirety, Plaintiff's Amended Complaint states he suffers a "chilling harm, as the uncertainty created by Defendants' unlawful conduct has already altered Plaintiff's present collecting activity[.]" Am. Compl. ¶ 33. Once again, Plaintiff has not provided any factual allegations to plausibly plead such harm. *See Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Even if he had provided any factual detail as to his supposed chill, Plaintiff has provided no legal theory justifying chilling in his context. While such harms are occasionally relevant in the constitutional context, *see, e.g.*, *Laird v. Tatum,* 408 U.S. 1, 13–14 (1972), there is no authority supporting such a harm in the coin collecting context. And that is particularly true here where Plaintiff has already disclaimed any "affirmative decision[] regarding the unlawful coin, *i.e.*, whether to acquire, avoid, or respond to

it, in a market that should not contain it[.]" Am. Compl. ¶ 33. At the very least, with such a concession, no chilling can occur as a matter of fact.

"Dignitary" Harm. Lastly, Plaintiff baldly asserts harm "from the government's use of the sovereign coinage system to perpetuate a violation of a statutory protection enacted to prevent exactly this kind of executive self-promotion through the currency." *Id.* Plaintiff has again alleged that he suffers a generalized harm from a supposed violation of law because he wants the law enforced. *See TransUnion*, 594 U.S. at 426 ("Article III standing requires a concrete injury even in the context of a statutory violation." (citation omitted)). But of course, simply stating a generalized objection to the government's issuance of coinage does not constitute injury in fact. *Allen v. Wright*, 468 U.S. 737, 751 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014); *see also Lujan*, 504 U.S. at 573–574.

And Plaintiff has alleged no concrete harm. *TransUnion*, 594 U.S. at 426; *see also Newdow v. Congress*, 435 F. Supp. 2d 1066, 1073 (E.D. Cal. 2006) ("Generally, a plaintiff does not sufficiently allege injury-in-fact for the purposes of Article III standing where the only harm is psychological injury 'produced by observation of conduct with which one disagrees.'" (quoting *Valley Forge,* 454 U.S. at 485)).

\* \* \*

Ultimately, Plaintiff has provided no case supporting a theory of standing. He has provided no plausible "factual material" supporting any of his unsupported theories. *See Ashcroft*, 556 U.S. at 678. And most important, what little information Plaintiff has provided disclaims any potential standing at all, as he has no plans to take any action with respect to the challenged governmental action. Am. Compl. ¶ 33. As a result, Plaintiff's Amended Complaint cannot establish standing,

Plaintiff's motion contains no theory of standing, and his preliminary injunction motion should be denied on that basis.

### B.    Plaintiff's Challenge Is Not Ripe for Judicial Review

Even if this Court were to conclude that Plaintiff has standing, the challenge is premature. "[T]he ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction[.]" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (citation omitted). The doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies" and "protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id.* at 807–808 (citation omitted); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).

To determine whether a challenge to an agency action is ripe for constitutional purposes (and satisfies the injury-in-fact requirement of Article III standing), courts ask "whether the issues presented are definite and concrete, not hypothetical or abstract." *Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1139 (9th Cir. 2024) (citation modified). And to determine whether a challenge is ripe prudentially, courts evaluate two factors: (1) "the fitness of the issues for judicial decision"; and (2) "the hardship to the parties of withholding court consideration." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). "Hardship in this context 'does not mean just anything that makes life harder; it means hardship of a legal kind, or something that imposes a significant practical harm upon the plaintiff.'" *Colwell v. Dep't of Health & Hum. Servs.*, 558 F.3d 1112, 1128 (9th Cir. 2009) (quoting *Nat. Res. Def. Council v. Abraham*, 388 F.3d 701, 706 (9th Cir. 2004)). "A claim is not ripe for

adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation modified).

A dispute about the proposed coin is not yet ripe, because the proposed design of the coin has not been reviewed and approved by the Secretary, and may be changed. *See* Stafford Decl. ¶ 33. For example, the Secretary might reject certain proposals by the Mint, or may propose additional changes to the design. The Secretary might reject the design entirely, and the proposed coins will never be minted. Or the Secretary could accept the proposed design wholesale. Moreover, production of the coins has not begun, nor have the coins been issued. *Id.* Once production begins, it will take several months to complete. *Id.* ¶ 35. Given the number of contingences that "may not occur as anticipated, or . . . may [never] occur at all[,]" the challenged gold coin is not yet fit for judicial decision. *Texas*, 523 U.S. at 300 (citation modified).

Moreover, Plaintiff does not adequately allege hardship in the absence of a judicial decision, for the same reasons discussed in the standing section above. Plaintiff cannot point to any harm from the coin's issuance, much less any legal harm. *Colwell*, 558 F.3d at 1128. For these reasons, Plaintiff's claim is not ripe.

## II.    Plaintiff Is Not Likely to Succeed on the Merits

The Court need not, and should not, reach the merits of this case given the dispositive jurisdictional defects discussed above. However, even if the Court concludes that Plaintiff has standing and this case is ripe for review, Plaintiff's motion should nonetheless be denied because Plaintiff is unlikely to succeed on the merits.

### A.    There is No Final Agency Action

"[F]inal agency action" is required for APA review. 5 U.S.C. § 704. Agency action requires a specific "rule, order, license, sanction, relief, or the equivalent." *Id.* § 551(13). It must be a

Fed. Defs.' Opp'n to Pl.'s Am. Mot. for Preliminary Injunction - 15

"discrete" act, *Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 64 (2004), and Plaintiff must identify the act being challenged to obtain review under the APA, *Whitewater Draw Natural Resource Conservation District v. Mayorkas*, 5 F.4th 997, 1010–1012 (9th Cir. 2021) (citing *Norton*, 542 U.S. at 61–62).

The Supreme Court has laid out a two-part test for finality, including that (1) "the action must mark the 'consummation' of the agency's decisionmaking process," rather than being "of a merely tentative or interlocutory nature[;]" and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]'" *Bennett v. Spear*, 520 U.S. 154, 177–178 (1997) (citation modified). The APA expressly excludes "preliminary, procedural, or intermediate agency action[s] or ruling[s]." 5 U.S.C. § 704.

As an initial matter, Plaintiff fails to identify the discrete action being challenged, as required for APA review. *Whitewater*, 5 F.4th at 1010. The Amended Complaint requests to vacate or enjoin "any agency action taken in furtherance" of the proposed coin, showing that Plaintiff has failed to identify any discrete action. Am. Compl. ¶ 54. Indeed, Plaintiff sometimes appears to challenge the Commission of Fine Arts' review of the proposed design, which he incorrectly frames as "final," Pl.'s Am. Mot. at 14, at other times the Plaintiff seems to be challenging the Mint's authority to put a living President on a coin generally, *id.* at 16, at other times Plaintiff seems to be challenging the production of the coins, *id.* at 3, while sometimes Plaintiff seems to challenge their distribution, *id.* at 7. Plaintiff's inability to identify what action is being challenged underscores the non-final nature of challenged governmental action, and that alone precludes APA review. *Norton*, 542 U.S. at 64.

Notwithstanding Plaintiff's inability to clearly articulate the basis for this lawsuit, the proposed coin fails both prongs of the test for final agency action. First, the proposed design for

the gold coin does not "mark the consummation of the agency's decisionmaking process[.]" *See Bennett*, 520 U.S. at 178 (citation modified). A challenged action "must not be of a merely tentative or interlocutory nature." *Id.* Rather, a court looks to see whether the agency "'has rendered its last word on the matter'" to determine whether an action is final and is ripe for judicial review. *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 984 (9th Cir. 2006) (citing *Whitman v. Am. Trucking Ass'n,* 531 U.S. 457, 478 (2001) (quoting *Harrison v. PPG Indus., Inc.,* 446 U.S. 578, 586 (1980)). Similarly, decisions that are "tentative" or issued by a "subordinate official" are not considered final. *Franklin*, 505 U.S. at 796 (quoting *Abbott Lab'ys*, 387 U.S. at 151); *see, e.g.*, *Franklin*, 505 U.S. at 798 (agency reports that serve as a tentative recommendation are not considered final, binding determinations).

Here, the proposed coin is just that—a proposal. The proposal was made by employees of the Mint, who are the Secretary's subordinates. The Mint views a design as "final" only once it is approved by the Secretary. Stafford Decl. ¶¶ 10, 33. As stated above, the Secretary may approve the design wholesale, or he may request changes, or he could even reject the proposal outright. *Id.* The agency will not take any further steps until they receive the Secretary's final approval. *Id.* Once he finally approves, the coins will take several months to mint before they will be auctioned. *Id.* ¶¶ 35–36. This is a paradigmatic nonfinal agency action under *Bennett*.

Second, the proposed coin does not determine rights or obligations, and no legal consequences flow from it. *Bennett*, 520 U.S. at 177–178 (1997). To satisfy this prong of the final agency action test, an action must be one that "impose[s] an obligation, denies a right, or fix[es] some legal relationship as a consummation of the administrative process." *Ukiah Valley Med. Ctr. v. F.T.C.*, 911 F.2d 261, 264 (9th Cir. 1990) (citation modified). Plaintiff points to no current legal effects caused by the proposed coin. Plaintiff himself pleads that he has not had to take any action,

or decided to take any action, as a result of the proposal. Am. Compl. ¶ 33. And even if the design were finalized, it would not result in any rights or obligations with respect to Plaintiff. The final design does not order him to buy the coin, prevent him from buying coins generally, alter his existing collection, or expose him to any enforcement proceedings. This prong of final agency action is not met, and APA review is precluded.

B.     **The Agency's Design Decisions Are Committed to Agency Discretion by Law**

Even if Plaintiff could point to a final, discrete agency action that determines his rights or obligations, Plaintiff's APA claims are precluded for another reason: the statute authorizing the proposed coin commits the design of the coin to agency discretion by law. Courts lack jurisdiction to hear an APA claim where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The statutory language indicates whether an act is committed to agency discretion. *See Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 719 (9th Cir. 2011) (in determining whether judicial review is precluded on § 701(a)(2) grounds, the court considers "the language of the statute and whether the general purposes of the statute would be endangered by judicial review." (quoting *County of Esmeralda v. Dep't of Energy,* 925 F.2d 1216, 1218 (9th Cir. 1991))). A statute that explicitly leaves decisions to an agency's "discretion" is a strong indicator that § 701(a)(2) applies and will bar judicial review, as does the use of the permissive word "may." *See Forsyth County v. Army Corp. of Eng'rs,* 633 F.3d 1032, 1041 (11th Cir. 2011) (statutory language created no law to apply because it indicated, in part, that agency had "discretion" to acquire land under the statute); *see also Haig v. Agee*, 453 U.S. 280, 294 n.26 (1981) (usual presumption is that "may" confers discretion).

Here, the authorizing statute states that "design[]" of gold coins is to be left to the Secretary's "discretion," who "may" mint gold coins under the subsection. 31 U.S.C. §

5112(i)(4)(C). Indeed, the statutory text is broad: the Secretary "may" mint and issue other bullion and proof gold coins under that subsection "in accordance with such program procedures and coin specifications, designs, varieties, quantities, denominations, and inscriptions as the Secretary, *in the Secretary's discretion*, *may* prescribe from time to time." *Id.* (emphasis added).[9] This permissive language, coupled with the unique expertise of the Mint in designing coinage, shows that design choices made under the subsection are committed to agency discretion, and APA review is barred by Section 701(a)(2).

### C.    Depicting the President on the Proposed Coin Is Not Contrary to Law

Even if this Court were to find that the proposed coin constitutes a final agency action not committed to agency discretion by law, Plaintiff's APA and nonstatutory claims still fail because no statutory violation has occurred.

### 1.    Subsection 5114(b) Applies Only to Paper Currency, Not Coins

Plaintiff contends that the proposed depiction of President Trump on a gold coin would violate Section 5114(b), which provides in relevant part that "[o]nly the portrait of a deceased individual may appear on United States currency and securities." Pl.'s Am. Mot. at 2–4 (citation omitted). However, Section 5114(b) does not apply because the text, structure, and history of the statute confirm that Section 5114 regulates paper currency only; coin design is separately governed by 31 U.S.C. § 5112.

As the Ninth Circuit has explained, "the meaning of statutory language, plain or not, depends on context." *United States v. Maciel-Alcala*, 598 F.3d 1239, 1244 (9th Cir. 2010) (citation

---

[9] 31 U.S.C. § 5112(i)(4)(C) states in full: "[t]he Secretary may continue to mint and issue coins in accordance with the specifications [for certain gold coins] at the same time the Secretary in minting and issuing other bullion and proof gold coins under this subsection in accordance with such program procedures and coin specifications, designs, varieties, quantities, denominations, and inscriptions as the Secretary, *in the Secretary's discretion*, *may* prescribe from time to time." (emphasis added).

omitted), *opinion amended and superseded*, 612 F.3d 1092 (9th Cir. 2010). Statutory terms must not be read in "isolation," but instead in their "context" and "place in the overall statutory structure." *Id.* (quoting *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133 (2000)). Here, the statutory text demonstrates that Section 5114 applies only to paper currency, while a separate provision, 31 U.S.C. § 5112, applies to coins.

The statutory structure makes sharp distinctions between paper currency and coinage. Section 5114 is titled: "Engraving and printing currency and security documents." 31 U.S.C. § 5114. It authorizes the Secretary of the Treasury, through the Bureau of Engraving and Printing, to print U.S. currency and securities. By contrast, Section 5112 is titled "Denominations, [S]pecifications, and [D]esign of [C]oins" and governs the minting and design of coins through the Mint. 31 U.S.C. § 5112.

The language in Section 5114 confirms that it could only apply to paper currency. The statute authorizes the Secretary to "engrave" and "print" United States currency using "intaglio plates on plate printing presses." 31 U.S.C. § 5114(a)(1). Coins, however, are not "printed." Stafford Decl. ¶ 14–15. Nor are coins produced on "intaglio plates on plate printing presses," which are printing tools used to transfer ink to paper under pressure. *Id.* ¶ 19. Instead, coins are struck using hardened steel dies engraved with the coin design, which is discussed in 31 U.S.C. § 5112(d)(2) ("The Secretary shall prepare the devices, models, hubs, and dies for coins, emblems, devices, inscriptions, and designs authorized under this chapter.").

Surrounding statutory provisions reinforce that Congress treated "currency" and "coins" as distinct concepts. When Congress intends to regulate both, it says so expressly. Section 5103, for example, provides that "United States coins and currency" are legal tender. 31 U.S.C. § 5103. Section 5120 separately addresses "obsolete and worn United States coins" and "currency." *Id.* §

5103. Section 5154 used "United States coins and currency" for state taxation. *Id*. § 5154. And Section 5118 *repeatedly* uses the phrase "coins or currency" when prohibiting enforcement of gold clauses in contracts. *Id*. § 5118. This repeated distinction strongly supports the inference that "currency" alone in Section 5114 does not include coins.

Section 5114(b)'s other requirements likewise demonstrate that it governs paper currency, not coins. The subsection imposes three requirements: (1) that "In God We Trust" is placed on currency; (2) that "[o]nly the portrait of a deceased individual may appear on United States currency and securities"; and (3) that "[t]he name of the individual shall be inscribed below the portrait." 31 U.S.C. § 5114(b).

The third requirement does not, and never has, described circulating coinage. Standard United States coins generally do not include the depicted individual's name below the portrait. Stafford Decl. ¶ 22. The first deceased person depicted on circulating United States coinage was President Abraham Lincoln, whose portrait appeared on the penny beginning in 1909 and remained there until production ceased in 2025. *Id.* Yet Lincoln's name was never inscribed below his portrait, as it is on paper currency. *Id.* The same is true of Thomas Jefferson on the nickel, Franklin Delano Roosevelt on the dime, George Washington on the quarter, and John F. Kennedy on the half dollar. *Id.* Paper currency, by contrast, follows exactly the format prescribed by Section 5114(b), where the name of the depicted individual is consistently inscribed below the portrait. *Id.*

Section 5112 separately prescribes design requirements specific to coins. Section 5112 also includes one of the requirements found in Section 5114(b): the phrase "In God We Trust." Section 5112(d)(1) states that "United States coins shall have the inscription 'In God We Trust.'" *Compare* 31 U.S.C. § 5112(d)(1) *with* § 5114(b). If Section 5114 already governed coins, there would have been no reason for Congress to repeat the "In God We Trust" requirement in the coin-design

statute. *See* Stafford Decl. ¶ 22. Plaintiff's interpretation that Section 5114(b) applies to coins would make Section 5112(d)(1) superfluous. But "a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous." *Clark v. Rameker*, 573 U.S. 122, 131 (2014) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)); *see also Nielsen v. Preap*, 586 U.S. 392, 414 (2019) ("[T]he interpretive canon against surplusage" is "the idea that 'every word and every provision is to be given effect [and that n]one should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.'" (alteration in original) (citation omitted)). The statutory scheme makes sense only if Section 5112—not Section 5114(b)—governs design requirements for coins. *See* Stafford Decl. ¶¶ 18–22.

The history of Section 5114 confirms the same conclusion. An earlier codification of the Thayer Amendment in the United States Code was titled "[p]ortraits of living persons on bonds or notes" and stated: "[n]o portrait shall be placed upon any of the bonds, securities, notes, fractional or postal currency of the United States, while the original of such portrait is living."[10]

In 1982, Congress consolidated and reorganized statutes pertaining to the financial system. *See* H.R. 6128, Pub. L. No. 97–258, 96 Stat 877 (1982). The 1982 act was titled, "[a]n Act to revise, codify, and enact *without substantive change* certain general and permanent laws, related to money and finance." *Id.* (emphasis added).

As part of that effort, the living portrait prohibition on bonds and notes was reorganized to 31 U.S.C. § 5114(b).[11] The Section 5114(b) reviser's notes explain that the now-operative phrase "[o]nly . . . of a deceased individual" was substituted for the phrase in the earlier codification,

---

[10] 31 U.S.C. § 5114 historical & revision notes, *available at* https://uscode.house.gov/browse/prelim@title31/subtitle4/chapter51/subchapter2&edition=prelim (last visited May 18, 2026).
[11] 31 U.S.C. § 5114 historical & revision notes.

"[n]o . . . while the original of such portrait is living," for "clarity."[12] The notes further explain that the original references to "bonds, securities, notes, fractional or postal currency of the United States" were consolidated into the revised phrase "United States currency and obligations," for "consistency."[13]

Those revisions cannot be read as substantive expansions of the statute absent a clear Congressional statement. The Supreme Court has repeatedly held that "[t]his Court does not infer that Congress, 'in revising and consolidating the laws, intended to change their policy, unless such an intention be clearly expressed.'" *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 645 (2022) (quoting *Muniz v. Hoffman*, 422 U.S. 454, 470 (1975)). Here, Congress expressed the contrary: the 1982 revisions were "without substantive change." Pub. L. No. 97–258 96 Stat. at 877. Moreover, the reviser's note to Section 5114 indicates the changes were made only for "clarity" and "consistency," confirming that Section 5114 continued to regulate paper currency rather than coinage.

In short, Plaintiff's contrary to law theory with respect to Section 5114(b) fails because Section 5114(b) does not apply to coins at all. That conclusion is confirmed not only by the subsection's text and surrounding provisions, but also by the fact that Congress placed coin-specific restrictions on depictions of living persons elsewhere in Section 5112, while omitting any such restriction from the subsection authorizing the proposed coin here. *See* 31 U.S.C. § 5112(i)(4)(C).

It is further confirmed by the Mint's decision to depict then-President Coolidge on the sesquicentennial coin in 1926, and other instances of living persons appearing on coinage after the Thayer Amendment's passage. *See* Stafford Decl. ¶¶ 37–40.

---

[12] 31 U.S.C. § 5114 historical & revision notes.
[13] *Id.*

### 2.    Section 5112(i), Not Section 5112(y), Governs the Proposed Coin

Plaintiff also incorrectly relies on Section 5112(y). The operative authority for the proposed coin is Section 5112(i)(4)(C), which expressly grants the Secretary "discretion" over the "designs" and other specifications of gold bullion coins. *See* 31 U.S.C. § 5112(i)(4)(C).

As such, the Mint is relying on Section 5112(i), not Section 5112(y), to issue the proposed coin. Stafford Decl. ¶ 30; *see also* Am. Compl. ¶ 60. The Gold Bullion Coin Act of 1985 first authorized the minting of gold coins under this section, *see* Pub. L. No. 99-185, 99 Stat. 1177 (1985), and Congress later amended the statute in 1996 to provide the Secretary with "discretion" to prescribe coin "designs," Consolidated Appropriations Act, 1998, Pub. L. No. 104-208, 110 Stat. 3009 (1996); *see also* 31 U.S.C. § 5112(i)(4)(C) (1996).

Plaintiff argues that Section 5112(i) is uniquely significant because it lacks the express living person prohibition that is found in other subsections of Section 5112. Pl.'s Am. Mot. at 5–6. However, at least two other subsections—Sections 5112(k) and (m)—also contain no such prohibition. And Plaintiff's theory of a later "legislative pattern" to reiterate the Thayer Amendment's living person prohibition is inconsistent with the statutory history, because Congress amended Section 5112(i) in 1996 while simultaneously adding a new, similar platinum-coin authority without incorporating the restrictions Plaintiff identifies. *See* 31 U.S.C. § 5112(k) (1996). Thus, the Mint properly relied on Section 5112(i)(4)(C) to authorize the proposed coin and has no need to rely on Section 5112(y) to authorize the coin instead.

Even if it were to apply, Section 5112(y) would not foreclose the proposed coin. Section 5112(aa)(1), which imposes standards and general provisions for several coin programs, including those of Section 5112(y), provides:

> "No head and shoulders portrait or bust of any person, *living or dead*, and no portrait of a living person may be included in the design *on the reverse* of any coin under [subsection (y)]."

31 U.S.C. § 5112(aa) (emphasis added). Congress's decision to limit the prohibition specifically to the reverse is significant, especially because other subsections impose broader prohibitions without regard to which side of the coin contains the depiction. For example, Section 5112(w)(4)(E) states that "[n]o head and shoulders portrait or bust of any person and no portrait of a living person may be included in the design of any coin issued under this subsection," without limiting the restriction to the reverse side. 31 U.S.C. § 5112(w)(4)(E).

That distinction also reflects ordinary coin design practice. The obverse side, commonly referred to as the "heads," generally contains the portrait, while the reverse side typically contains symbolic imagery. *See, e.g.*, 31 U.S.C. §§ 5112(o) ("The design on the obverse . . . shall contain . . . the spouse of a President" and "[t]he design on the reverse . . . shall bear . . . images emblematic of the life and work of the First Spouse whose image is borne on the obverse"), (x) ("The design on the obverse . . . shall maintain a likeness of George Washington."). Congress's reverse-side limitation in Section 5112(aa) thus appears designed to preserve symbolic imagery on the reverse side of semiquincentennial coins. This is further reflected by the fact that Section 5112(aa) also prevents both living *and* deceased persons from being depicted on the reverse.

The proposed coin complies with the requirements in Section 5112(aa). The proposed design places President Trump's portrait on the obverse side and an eagle on the reverse side. Stafford Decl. ¶ 29, Ex. A. Accordingly, the coin does not violate either Section 5112(y) or Section 5112(aa), even assuming those provisions apply.

For these reasons, Plaintiff is unlikely to succeed on either of his contrary to law claims, because the coin does not violate Section 5114(b) or Section 5112(y).

### D.      Plaintiff's Nonstatutory Ultra Vires Claim Fails

Plaintiff lacks a cause of action to bring a nonstatutory claim challenging the proposed coin as a violation of Section 5114(b), because he is already bringing a near-identical claim under the APA. *See* Am. Compl., ¶¶ 50–58. The Supreme Court recently reiterated that ultra vires review is unavailable "if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review, or if a statutory review scheme forecloses all other forms of judicial review." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (citation modified); *see also Am. Foreign Serv. Ass'n v. Trump*, No. 25-5184, 2025 WL 1742853, at \*2 (D.C. Cir. June 20, 2025) ("[*U*]*ltra vires* review — which is a suit in equity, not a statutory cause of action — is 'strictly limited' when 'other judicial-review statutes' are present." (citation omitted)).

Here, the APA provides Plaintiff with a meaningful opportunity for judicial review, and this Court should not allow Plaintiff's request for "ultra vires review" to make "an easy end-run around the limitations of . . . judicial-review statutes," like the APA, simply because Plaintiff filed his complaint too early to use the "statutory avenue" that Congress provided. *Nuclear Regul. Comm'n*, 605 U.S. at 675, 675, 681–82 (an ultra vires challenge is "essentially a Hail Mary pass" that "rarely succeeds" (citation omitted)). A meaningful avenue for review does not mean Plaintiff must succeed on his APA claim. Thus, irrespective of whether Plaintiff prevails in his APA claims, Plaintiff cannot bring an *ultra vires* claim for alleged statutory violations.

## III.   Plaintiff Cannot Show Irreparable Harm

"A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary

injunctive relief." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citing *L.A. Mem'l Coliseum Comm'n v. NFL,* 634 F.2d 1197, 1201 (9th Cir. 1980)).

Plaintiff fails to satisfy that standard and repeatedly misstates the governing law. He asserts, without citation, that "[i]rreparable harm is established where, as here, the injury cannot be adequately remedied by money damages or post-issuance relief." Pl.'s Am. Mot. at 10. But while an inability to recover money damages may be relevant to irreparable harm, it is not sufficient by itself to establish irreparable harm. A plaintiff must also show that the threatened injury is non-speculative and likely to occur. *Ocean Beauty Seafoods, LLC v. Pac. Seafood Grp. Acquisition Co., Inc.*, 648 F. App'x 709, 711 (9th Cir. 2016); *see also Edwards Vacuum, LLC v. Hoffman Instrumentation Supply, Inc.*, 538 F.Supp.3d 1132, 1145 (D. Or. 2021). Nor may a Plaintiff manufacture irreparable harm through self-inflicted injuries. *Bennett v. Isagenix Int'l LLC*, 118 F.4th 1120, 1129 (9th Cir. 2024).

Plaintiff fails to demonstrate that he himself is likely to suffer irreparable harm absent emergency relief. *See Winter*, 555 U.S. at 20 ("A plaintiff seeking a preliminary injunction must establish . . . that *he* is likely to suffer irreparable harm in the absence of preliminary relief." (emphasis added)). As discussed above, Plaintiff never explains how the issuance of gold coins would concretely injure him. Instead, he speculates that once the coins are "placed into commerce they cannot practicably be recalled," and that any later effort to collect or destroy them would be "logistically impossible." Pl.'s Am. Mot. at 10. Those assertions are exaggerated. Under the current proposal, only 47 gold coins would be issued. Stafford Decl. ¶ 32. More fundamentally, however, Plaintiff identifies no concrete injury he personally would suffer from the coins entering commerce. Conclusory allegations of downstream market effects, without any supporting facts, do not satisfy ordinary pleading standards, much less the "extraordinary" showing of harm required

Fed. Defs.' Opp'n to Pl.'s Am. Mot. for Preliminary Injunction - 27

for preliminary injunctive relief. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014) (quoting *Munaf v. Geren,* 553 U.S. 674, 689 (2008)).

Plaintiff also contends that irreparable harm arises from the alleged "erosion of a statutory safeguard" against "political self-promotion and self-glorification." Pl.'s Am. Mot. at 10.  But that argument improperly conflates the merits inquiry with the irreparable-harm requirement. The Ninth Circuit has expressly rejected any presumption of irreparable harm based solely on an alleged statutory violation. *See Small ex rel. NLRB v. Operative Plasterers' & Cement Masons' Int'l Ass'n Loc. 200*, 611 F.3d 483, 494 (9th Cir. 2010) (rejecting the rule that irreparable injury is presumed once likelihood of success is established in statutory enforcement actions). Thus, even assuming Plaintiff had identified a viable statutory claim—which he has not—that alone would not establish irreparable harm.

Plaintiff's declaration fares no better. He asserts that the "regulatory and taxonomic framework" he relies on "in evaluating, acquiring, and holding coins" will be "disrupt[ed]," causing a "concrete harm to the integrity of my existing collection and to my ongoing and future collecting practice." Pl.'s Decl. ¶ 4, ECF No. 6. But that alleged injury is speculative economic harm, not irreparable injury. *See Caribbean Marine Servs. Co.*, 844 F.2d at 674 (rejecting claim of irreparable harm based on speculative future injury). At most, Plaintiff speculates that issuance of a new coin may affect the collector's market and, indirectly, the value or composition of his own unspecified collection. Pl.'s Decl. ¶ 4. He offers no explanation for how issuance of a limited number of coins would negatively affect the market at all—indeed, the opposite may be true—let alone how any such market effect would concretely injure his own "ongoing and future collecting practice." *Id.* Nor does he cite any authority recognizing standing or irreparable harm based on such a theory.

Nor are Plaintiff's alleged harms "imminent." *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166 (9th Cir. 2011) (denying emergency relief where the alleged harms depended on uncertain future decisions). Plaintiff incorrectly asserts, without citation, that July 4, 2026, is the "target issuance date" which "makes relief urgent." Pl.'s Am. Mot. at 10. That is incorrect. No target issuance date has been set. Stafford Decl. ¶ 34. The coin design has not yet been finalized and remains subject to change. Stafford Decl. ¶ 33. Production cannot begin until the design is finalized. *Id.* ¶ 34. Issuance by July 4, 2026 is not possible given the monthslong production and auction process required before release. *Id.* ¶¶ 34–36.

Because the design remains non-final and production has not begun, Plaintiff's asserted harms depend on a chain of contingencies and assumptions about future events. Such speculative allegations are insufficient to establish the immediate, likely, and irreparable injury required for preliminary injunctive relief. *Ocean Beauty*, 648 F. App'x at 711. Plaintiff's motion should be denied.

## IV.    The Balance of the Equities and the Public Interest Favor Defendants

Plaintiff contends "[i]t is always in the public interest to prevent the violation of a party's constitutional [and statutory] rights." Pl.'s Am. Mot. at 12 (second alteration in original) (quoting *Melendres v. Arpaio,* 695 F.3d 990, 1002 (9th Cir. 2012)). Plaintiff not only misstates the law, he misquotes the citation he purports to use as a basis for this motion. Plaintiff has inserted the phrase "[and statutory]" into the quotation. *Compare* Pl.'s Am. Mot. at 12 *with Melendres*, 695 F.3d at 1002. *Melendres* concerned allegations of racial discrimination in violation of the Fourth and Fourteenth Amendments and Title VI of the Civil Rights Act of 1964, not ordinary statutory claims like those that Plaintiff asserts. *Melendres*, 695 F.3d at 995. It is therefore inapposite and does not support Plaintiff's argument that the public has an interest in "the enforcement of statutes Congress

enacted to prevent executive self-aggrandizement and self-glorification" and "executive overreach." Pl.'s Am. Mot. at 12–13. Plaintiff's argument assumes the merits and attempts to use alleged statutory violations to satisfy all prongs of the preliminary injunction standard. That is not the law. Moreover, Plaintiff overlooks that the public interest disfavors halting a federal coin program at the request of a plaintiff who has shown no concrete injury and likely no statutory violation.

Plaintiff's only other assertion regarding the public interest factor is a red herring. Without citing any sources, Plaintiff claims that the Mint removed a recording of a Citizens Coin Advisory Committee ("CCAC") meeting on February 24, 2026, and that such a removal implicates "[t]he public interest in transparent government." Pl.'s Am. Mot. at 12. As an initial matter, the CCAC website—a government website—has the publicly available transcript, audio recording, and meeting minutes for the February 24, 2026 meeting to which Plaintiff appears to refer.[14] Given that an audio recording of the meeting is publicly available on a government website, Plaintiff's contention that the Mint has engaged in a "suppression of the official record of a federally mandated advisory body's deliberations" cannot be squared with the facts. Pl.'s Am. Mot. at 12. Finally, to the extent that Plaintiff appears to argue that the CCAC's opinion should control, the statute creating the CCAC clarifies that its role is to advise the Mint, and the CCAC has no final decisionmaking authority. *See* 31 U.S.C. § 5135.

More importantly, Plaintiff's contention regarding a CCAC meeting bears no relation to the relevant legal question here, which is whether granting Plaintiff's requested relief would harm

---

[14] *See* CCAC, *CCAC Meetings, Recommendations and Minutes*, *available at* https://www.ccac.gov/meetings (last visited May 18, 2026); *see also* CCAC, *Minutes of CCAC Public Meeting (Virtual)* (Feb 24, 2026), https://perma.cc/DK3Q-KPJR; CCAC, Transcript of Remote Proceeding Moderated by Donald Scarinci (Feb. 24, 2026), https://perma.cc/N5N5-UNZW; CCAC*, February 24, 2026 Audio Files* (Feb. 24, 2026), https://www.ccac.gov/system/files/2026-03/CCAC_Feb_2026_Mtg_audio_part_1.mp3.

the government and the public interest, whose interests "merge" in this context. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). And this factor favors the government, as granting Plaintiff's requested relief would prevent the government from acting on its statutory authority to design and issue gold coins for the public's benefit. *See* 31 U.S.C. § 5112(i)(4)(C).

## V.      Any Injunctive Relief Should be Narrowly Tailored

Because "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," the Court should be cautious in fashioning any injunction. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). To the extent the Court intends to grant Plaintiff's request for a preliminary injunction, such relief should be narrowly tailored to apply only to the proposed coin that Plaintiff alleges affects him and leave intact the Executive's discretion to engage in further consideration of the topic at hand and implement new policies consistent with law.

And the Court should only order relief that flows from the claims it concludes are likely to succeed on the merits, to those Defendants for which the claims and relief are applicable. That result flows inexorably from *Murthy*'s command that "'plaintiffs must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief.'" *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (citation omitted).

Plaintiff requests an injunction preventing Defendants from "producing, distributing, issuing, selling, or otherwise placing into commerce any coin bearing the likeness of President Donald J. Trump, pending final resolution of this action." Pl.'s Am. Mot. at 16. This is overbroad. Plaintiff's lawsuit only addresses the proposed large coin design to be issued under Section 5114(i)(4)(C) that was presented before the Commission of Fine Arts, and he contends his alleged injuries arise from this coin only. Am. Compl. ¶¶ 1, 3, 33. Thus, to the extent the Court concludes

Fed. Defs.' Opp'n to Pl.'s Am. Mot. for Preliminary Injunction - 31

that Plaintiff has standing to challenge the design and issuance of the proposed coin, any injunctive relief should be limited to the proposed coin he has standing to challenge.

## VI.    Any Injunctive Relief Should be Stayed Pending Appeal and Be Accompanied by a Bond

To the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum, administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

Defendants also respectfully request that any injunctive relief accompany a nominal bond under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A nominal bond is appropriate here in the event that the government is found to have been wrongfully enjoined.

## CONCLUSION

For these reasons, this Court should deny Plaintiff's First Amended Motion for a Preliminary Injunction.

Dated: May 18, 2026                          Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

STEPHEN M. ELLIOTT
Assistant Branch Director

*/s/ Kathryn Barragan*

KATHRYN BARRAGAN
D.C. Bar No. 90026294
Trial Attorney
U.S. Department of Justice
Civil Division
Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 598-7696
Email: Kathryn.e.barragan@usdoj.gov

*Counsel for Defendants*