**BRETT A. SHUMATE**
Assistant Attorney General
Civil Division
**ERIC J. HAMILTON**
Deputy Assistant Attorney General
**STEPHEN M. ELLIOTT**
Assistant Branch Director
**KATHRYN BARRAGAN (D.C. Bar No. 90026294)**
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 598-7696
Email: kathryn.e.barragan@usdoj.gov
*Counsel for Defendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| JAMES M. RICKHER, | Case No.: 3:26-cv-00569-AR |
| Plaintiff, | |
| v. | DECLARATION IN SUPPORT OF FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFF'S FIRST AMENDED MOTION FOR A PRELIMINARY INJUNCTION |
| MEGAN SULLIVAN, in her official capacity as Acting Chief of Design Management at the United States Mint, *et al.*, | |
| Defendants. | |

**DECLARATION OF APRIL STAFFORD,**
**ACTING ASSOCIATE DIRECTOR FOR SALES & MARKETING**
**THE UNITED STATES MINT**
**UNITED STATES DEPARTMENT OF THE TREASURY**

I, April Stafford, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information known to me from official records reasonably relied upon by me in the course of my employment, hereby declare as follows relating to the above titled matter. Records attached to this declaration are true and accurate copies of records maintained in the ordinary course of business.

1.      I am Director of the Office of Design Management at the United States Mint (Mint), but I have been serving on a detail assignment as either Acting Associate Director (head) or Acting Deputy Associate Director of the Sales and Marketing Directorate at the Mint since February 2025.

2.      I have served at the Mint since November 2000 and have had many roles during my over twenty-five-year tenure. I began my service as the education coordinator for the Mint's website for children and teachers. I later served as Outreach and Education Branch Chief, where my responsibility expanded to include management of the usmint.gov informational site. I later served as Acting Assistant Director of Special Programs/Products in Sales & Marketing and, later as a manager in Sales & Marketing's Customer Operations responsible for the Mint's Retail Call Center and Fulfillment services.

3.      In January 2013, I was promoted to Director, Office of Design Management. As Director of the Office of Design Management, I am responsible for the design development of all United States coins and medals. In this capacity, I work closely with legislative liaisons, subject matter experts, federal advisory committees, artists, and the Mint's production planning office, to

2

develop designs that meet legislative and programmatic requirements. The head of the Office of Design Management manages the design selection and approval process, culminating with the formal selections of coin and medal designs made by the Secretary of the Treasury.

4.      In my detailee role as Acting Associate Director (or Deputy Associate Director) for the Sales and Marketing Directorate, I manage the entire Sales and Marketing team, with responsibility for both bullion and numismatic business lines. Specifically, the Directorate manages the bulk and bullion programs, numismatic product development and management, customer care, the retail sales system, order fulfillment and warehouse management, product marketing, and creative services.

5.      Throughout my twenty-five-year career at the Mint, I have been directly involved in the development of more than 250 coins and medals issued by the Secretary of the Treasury under a variety of authorities, and featuring a variety of designs, metals, and denominations. Although my career has focused on education, design, and sales, I have worked closely with all facets of Mint operations, including manufacturing and procurement.

6.      I, and the Sales and Marketing Directorate, have been involved in the planning and development work for the proposed 24-karat gold coin depicting the President since approximately February 17. As is the case with other prospective coin and medal products, the Sales and Marketing team develops recommended mintages and coin specifications (such as the size), and has responsibility to plan the product development.

**Authorities for Minting and Issuing Coins**

7.      The Mint produces a variety of legal tender coin products under a variety of statutory authorities. Circulating coins (issued to banks for use in commerce), numismatic coins

3

(coins purchased by collectors) and bullion coins (coins purchased by investors for their precious metal content) are generally issued under the authority of 31 U.S.C. § 5112.

8. The Mint also issues coins that have been authorized by specific public laws. These include the modern versions of Morgan and Peace silver dollars (Public Law 116-286). Additionally, the Mint produces and issues Commemorative Coins based upon specific laws that direct the Mint to do so. Commemorative Coins are a category of numismatic coins that are sold with a surcharge. Profits derived from the surcharge (if certain conditions are met) are provided to a recipient organization designated by Congress (e.g., U.S. Marine 250th Anniversary Coins, issued in 2025, with surcharges authorized to be paid to the Marine Corps Heritage Foundation, Public Law 118-10).

**The Mint's Role in Coin Selection and Manufacturing**

9. The Mint serves as the Secretary's agent for coin design and production. The Mint is responsible for creating initial design concepts, developing detailed two-dimensional design portfolios, presenting these portfolios to statutory stakeholders for their consultation, and developing a final design recommendation. At the end of this design and consultation process, the Director of the Mint presents these concepts, and the recommended design, to the Secretary of the Treasury for review and selection.

10. The Secretary or his/her designee has traditionally signed or initialed an action memorandum denoting his or her concurrence with the design recommendation. At this point, the Mint considers the design to have been selected by the Secretary and initiates the production process.

11. The initial steps of the production process involve Mint medallic artists translating the approved two-dimensional design into a three-dimensional model, either through

a physical plaster mold or through digital design tools. Under the Mint's modern manufacturing process, the three-dimensional model, once reviewed and approved through an internal review process involving several Mint offices and Directorates, serves as the basis for engraving master dies that will be used in the manufacturing process. These master dies are created either through a computer-numerically-controlled (CNC) milling machine or through a laser engraving process. These master dies, after being heat treated to harden the steel, are then used as a basis for creating production dies that are used to physically manufacture coins.

12.    Coins are "minted" or "struck" in industrial presses where a blank piece of metal (non-precious metal for circulating; non-precious or precious metals for numismatic) is squeezed at high pressure between dies bearing a negative obverse and reverse image, which will leave an impression on the blank. Circulating coins can be made at a rate of up to 750 per minute per press. Numismatic and collectible coins, by contrast, are generally produced at a slower rate to ensure a near-flawless appearance.

13.    Once produced and inspected, coins are issued to the public through a variety of channels. Circulating coins are typically issued to banks for use in commerce via the Federal Reserve Banks. Numismatic and commemorative coins are typically sold to the public through the Mint's e-commerce site at usmint.gov, through physical sales locations at the Philadelphia Mint, Denver Mint, and Mint Headquarters, at coin shows, and through private vendors via the Mint's bulk sales program. Particularly rare or unique coins are occasionally sold via auction, as discussed further below.

14.    The Mint operates at no cost to the taxpayer and proceeds from the sale of coins are deposited into the Public Enterprise Fund (established by 31 U.S.C. § 5136) to support the Mint's operations and programs.

**Distinction Between Printing of Currency and Minting of Coinage**

15.     It has been the historical understanding of the Mint that "coins" are distinct from "currency." Moreover, my understanding is that the production process for producing coins differs significantly from the process used to print currency. Federal Reserve notes (paper currency) are not, and never have been, produced by the Mint. Rather, the Bureau of Engraving and Printing (BEP) is responsible for printing paper currency.

15.     The Mint has neither the responsibility nor the authority to engrave and print United States currency and bonds of the United States Government or those of its territories and possessions.

16.     While both the Mint and BEP rely on "engraving" in their respective production processes, the term has a different meaning and process for each.

17.     As discussed above, the Mint employs a team of medallic artists, also known as engravers, who use their artistic skills to translate two-dimensional coin art into a three-dimensional plaster cast or digital model. This model serves as a basis for engraving dies, which are ultimately used to form the image on the coin blank.

18.     I am not intimately familiar with the process employed by the BEP for the printing of currency, having never worked for that Bureau. However, having read 31 U.S.C. § 5114(a)(1), I can say that none of the processes and terminology discussed in that provision are used in the coin production process.

19.     The Mint "strikes" or "mints" coins. The coin production process does not, at any point, involve "printing," and printing presses are not used in coin production. To the best of my knowledge, the Mint has never used intaglio plates for coin production as this technology

involves the deposition of ink on paper and is completely incompatible with the formation of designs on metal discs.

20.    I note that sub-section (c) of 31 U.S.C. § 5114 refers to the use of "distinctive paper for United States currency and securities." Again, while it is my understanding that BEP uses such "distinctive paper" in the production of certain denominations of currency note, the Mint does not in any way rely on paper, distinctive or otherwise, for the production of coins. Coins are exclusively produced from precious or non-precious metals.

21.    Regarding the first sentence of 31 U.S.C. § 5114(b), which states that "United States currency has the inscription 'In God We Trust' in a place the Secretary decides is appropriate," I acknowledge that coins produced by the Mint bear the inscription "In God We Trust" and have for decades. However, the Mint interprets its obligation to include this inscription to come from a similar, but separate, provision of law at 31 U.S.C. § 5112, the Mint's primary authority for minting legal tender coinage, which, itself states that "United States coins shall have the inscription 'In God We Trust.'" (31 U.S.C. § 5112(d)(1)).

22.    I note that 31 U.S.C. § 5114(b) includes the following sentence stating that "[t]he name of the [deceased] individual shall be inscribed below the portrait." The first deceased, real, person to be depicted on a United States circulating coin was President Abraham Lincoln. His image appeared on the obverse of the penny from 1909 until the cessation of production in 2025. At no point was his name ever inscribed below his portrait, as it is on paper currency. The same applies to the portrait of Thomas Jefferson on the nickel (since 1938), Franklin Delano Roosevelt on the dime (since 1946), George Washington on the quarter dollar (since 1932), and John F. Kennedy on the half dollar (since 1964). Additionally, in the various modern renditions of the circulating dollar coin featuring Dwight D. Eisenhower, Susan B. Anthony, and (currently)

Sacagawea, none of the honorees have had their names inscribed below their portraits. This can be contrasted with the practice BEP employs on currency notes, where the name of the depicted individual is consistently inscribed below their portrait.

### Minting of Gold Coinage

23. Historically, the Mint issued gold coins for circulation until the early 1930s. Modern gold coins, however, are minted and issued only for numismatic and bullion purposes. During my over twenty-five-year tenure, the Mint has relied upon the discretion granted to the Secretary at 31 U.S.C. § 5112(i)(4)(C) to mint and issue numismatic gold coins. It is my understanding that this provision permits the Secretary to mint and issue gold coins according to the specifications, designs, varieties, quantities, denominations, and inscriptions that the Secretary may prescribe in his or her discretion.

24. The Mint, and the Secretary, have relied upon the broad discretion at Section 5112(i)(4)(C) to create a variety of gold coin designs, sizes, and denominations over the past two decades. Many of the designs feature allegorical depictions of Liberty (typically a young woman) on the obverse and an eagle on the reverse. However, the Mint has also produced gold versions of the Sacagawea $1 coin and the Lincoln Penny, gold coins featuring comic book heroes, and gold coins featuring images from nature such as a sunflower, a wild Mustang, and a Bristlecone Pine. To the best of my knowledge, troy weights (the system of weight measurement used for precious metals) have ranged from 0.1 oz to 1 ounce, and denominations (the coin's face value) have ranged from one cent to 100 dollars.

25. Each of these gold coins was sold at a price that exceeded the face value of the coin and encompassed the value of the precious metal plus the Mint's manufacturing costs.

These coins are legal tender based upon their face value. However, as numismatic items, they are seldom, if ever, used in commerce.

## Auctioning of Coinage

26.     While the majority of the Mint's gold coins are sold at an established price via the Mint e-commerce site, in-person sales, or bulk sales, the Mint occasionally relies upon auctions for the sale of unique or rare coins.

27.     In recent years, the Mint has utilized auctions on four occasions: in 2022, the Mint auctioned special 2021 dated "American Eagle at Dusk and Dawn" 35th anniversary gold and silver bullion coins. In 2024, the Mint auctioned 230 gold coins with a special privy mark to commemorate the 230th anniversary of the original "flowing hair" coin first issued in 1794. In 2025, the Mint held two auctions: one for the sale of seven 22-karat gold Sacagawea $1 coins that had flown aboard Space Shuttle Columbia, and one for the sale of 232 gold pennies to celebrate the end of 232 years of penny production.

28.     The Mint does not have in-house auctioneers and instead obtains the service of a private auction house through a competitive solicitation process. As is the case with standard coin sales, the proceeds from the auctions (less auctioneer fees) are deposited into the Public Enterprise Fund.

## The Large 24k Semiquincentennial Coin

29.     The Mint is currently in the design stage of a large 24k gold coin depicting President Trump in commemoration of the United States Semiquincentennial. As currently proposed, the obverse of the coin would feature an image of President Trump standing at his desk, and the reverse would feature a Bald Eagle atop the Liberty Bell, preparing to take flight. **<u>The proposed design is attached hereto as Exhibit A.</u>**

30.     Although new circulating coins composed of non-precious metals are planned for issuance in 2026 to celebrate the Semiquincentennial under the Semiquincentennial coin authority of 31 U.S.C. § 5112(y), this gold coin, while celebrating the Semiquincentennial, would be issued under the Mint's broad gold coin authority of 31 U.S.C. § 5112(i)(4)(C). Notably, the Mint will be issuing other gold coins in 2026 celebrating the Semiquincentennial under the authority of 31 U.S.C. § 5112(i)(4)(C) featuring designs unrelated to the President.

31.     As envisioned, the coin will be minted on a large (3" diameter) 24k gold blank that has traditionally been used to manufacture Congressional Gold Medals.

32.     Only 47 coins are planned for issuance. Each of these coins will be machined individually, and each will therefore have a somewhat variable weight of gold (approximately 19.7 oz. each). The estimated value of the coin's precious metal content alone is approximately $90,000 based upon commodities prices on the date of this declaration. However, as I discussed earlier in my declaration, it is typical for the sales price of a gold coin to exceed its "face value."

33.     The Mint has not struck production coins yet as the Secretary has not yet approved the final design of this coin. It is my understanding that the Treasury Department is still in consultations regarding the design, and it is possible that changes may be requested.

34.     There is no official on-sale date for this gold coin. While the coin will be minted in celebration of the Semiquincentennial on July 4, 2026, this is not the target date for issuance of the coin as the coin design still has not been approved as of May 18, 2026, and production cannot begin until the design is approved.

35.     Once approval is given by the Secretary, assuming that no significant changes are required, the Mint estimates that approximately six to eight weeks would be required to begin striking coins. This time period reflects the steps involved in the manufacturing process, as

detailed above.  After the Mint begins striking coins, the Mint estimates that it would take several months to produce the target number of 47 coins due to the significant amount of custom hand-work that machinists from the Mint would need to employ to produce a coin of the proposed size.  The typical production rate for an item of such size is two per week.

36.    Although no contract has been solicited, the Mint intends to auction these 47 coins. The Mint's intention to do so is based upon several factors, including the large size (and inherent precious metal value) of the gold coin, the low number to be produced, and the bespoke nature of each coin. The Mint will not begin the solicitation process unless and until the coin is finally approved by the Secretary. It is expected that any auction of the coins would lag the production of the coins by several weeks, as the selected auction house would need time to retrieve the coins from the production facility, inspect them, obtain an independent grading by a third-party grading service, and advertise the sale.

### Previous Coins Featuring Living Persons

37.    In the history of United States coin production, few living persons have been depicted on coins.  However, this is not without exception.  It is my understanding that the first coin to feature a living person was a commemorative half dollar coin honoring the centennial of the state of Alabama. This coin, issued in 1921, features on the obverse busts of the late William Wyatt Bibb, the first governor of Alabama, and the then-living T.E. Kilby, governor at the time of the event. The authorizing law for this commemorative coin (Public Law 66-200) gave discretion to the Mint and Secretary on the design of the coin and did not affirmatively authorize the depiction of a living person. **A photograph of the obverse of the Alabama half dollar coin is attached hereto as Exhibit B.**

38.     In 1926, then-living President Calvin Coolidge was featured on the obverse of a commemorative half dollar coin along with President George Washington in celebration of the nation's sesquicentennial. Again, the authorizing law for this commemorative coin (Public Law 68-62) gave discretion to the Mint and Secretary on the design of the coin and did not affirmatively authorize the depiction of a living person. **A photograph of the obverse of the Coolidge coin is attached hereto as Exhibit C.**

39.     Most recently, in 1995, the Mint issued a commemorative one-dollar coin celebrating the Special Olympics. The obverse of the coin featured a bust of then-living Eunice Kennedy Shriver, founder of the Special Olympics. As was the case with the two previously-mentioned coined programs, discretion was given to the Secretary on the design of the coin, and the depiction of a living person was not affirmatively discussed in the law. **A photograph of the obverse of the Eunice Kennedy Shriver coin is attached hereto as Exhibit D.**

40.     It is my understanding that the so-called "Thayer Amendment" of 1866 or a similar provision prohibiting the portrait or likeness of any living person from being placed upon United States currency was in effect when each of the above-mentioned coins was minted and issued.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed this 18th day of May 2026.

April Stafford
Acting Associate Director for Sales & Marketing
The United States Mint
United States Department of the Treasury